UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUIS MICHAEL PALUZZI, | No. C 03-5825 SI (pr) |
|     Petitioner, | **ORDER DENYING HABEAS PETITION** |
|     v. | |
| J. SOLIS, warden, | |
|     Respondent. | |

## INTRODUCTION

Louis Michael Paluzzi, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Louis Michael Paluzzi was convicted in San Bernardino County Superior Court of second degree murder and was sentenced in 1980 to 17 years to life in prison. His habeas petition does not challenge his conviction but instead challenges an October 30, 2000 decision of the Board of Prison Terms, now known as and referred to herein as the Board of Parole Hearings ("BPH"), that found him not suitable for parole. The 2000 hearing was Paluzzi's ninth parole hearing, and was conducted at a time when he was about twenty years into his sentence and about ten years past his minimum eligible parole date of May 25, 2000.

The BPH identified the circumstances of the commitment offense, Paluzzi's escalating criminality and his need for further therapy regarding the causative factors for the commitment offense as the reasons for the determination that he was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Pet. Exh. H (reporter's transcript of October 30, 2000 BPH hearing (hereinafter "RT")) at 67-69. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Paluzzi sought relief in the California courts. He filed a habeas petition in the San Bernardino County Superior Court that was denied in a reasoned decision. Pet. Exh. A. The California Court of Appeal summarily denied Paluzzi's habeas petition. Pet. Exh. B. The California Supreme Court denied his habeas petition with a citation to In re Dexter, 25 Cal. 3d 921 (1979). Pet. Exh. C.

Paluzzi then filed his federal petition for a writ of habeas corpus. The court found cognizable a claim that there was not sufficient evidence to support the BPH's decision and ordered respondent to show cause why the writ should not issue. Respondent filed an answer and petitioner filed a traverse. On July 28, 2004, this court dismissed the petition as moot based on the fact that Paluzzi had received another parole hearing on September 23, 2003 at which he was again found not suitable for parole. Paluzzi appealed and the Ninth Circuit vacated the mootness dismissal and remanded the case. The Ninth Circuit determined that Paluzzi's challenges were not moot because his problems were capable of repetition yet evading review. On remand, the court permitted the parties to file supplemental briefs, which petitioner and respondent have done. The matter is now ready for a decision.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a petitioner housed at a prison in Soledad in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

2

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c).

Respondent argues that state judicial remedies have not been exhausted for the claim in the petition because the California Supreme Court denied Paluzzi's petition with a citation to In re Dexter, 25 Cal. 3d 921 (1979) (petition directed to an institutional decision cannot be pursued unless administrative remedies are first exhausted). Paluzzi points out that respondent conceded in the state superior court habeas action that Paluzzi had "filed an administrative appeal regarding his October 30, 2000 hearing which was denied by the Board of Prison Terms Appeals Unit." See Denial And Exception To The Answer (docket # 6), Exh. 1, p. 4.  In light of respondent's concession in state court at a time when any failure to exhaust could have been cured, respondent will be deemed to have waived any exhaustion defense and any procedural default argument based on non-exhaustion.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).  Section 2254(d) applies to a habeas petition from a state prisoner challenging

3

1 the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.  Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir. 2008); Sass, 461 F.3d at 1127-28; Cal. Penal Code § 3041(b); see also Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).[1] The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129.

What little guidance has come from the Supreme Court suggests that judicial review

---

[1] Although Sass saw the requirement that the decision not be "otherwise arbitrary" as part of the "some evidence" standard, 461 F.3d at 1129, Hayward saw the "some evidence" requirement as separate from the requirement that the decision not be "otherwise arbitrary." Hayward quoted Irons, infra, for the proposition: "We have held that 'the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary."'" Hayward, 512 F.3d at 542.

4

1 should be extremely deferential to the original decision-maker in the parole context.  In addition 2 to the very low evidentiary standard that <u>Superintendent v. Hill</u> imposes, other Supreme Court 3 comments suggest that the judiciary should be quite mindful of the subjective and predictive 4 nature of a parole board's decision.  <u>See</u> <u>Greenholtz</u>, 442 U.S. at 13.  "No ideal, error-free way 5 to make parole-release decisions has been developed; the whole question has been and will 6 continue to be the subject of experimentation involving analysis of psychological factors 7 combined with fact evaluation guided by the practical experience of decisionmakers in 8 predicting future behavior.  Our system of federalism encourages this state experimentation." 9 <u>Id.</u>; <u>see also</u> <u>id.</u> at 8.

10       Having determined that there is a due process right, and that some evidence is the 11 evidentiary standard for judicial review, the next step is to look to state law because that sets the 12 criteria to which the some evidence standard applies.  <u>See</u> <u>Hayward</u>, 512 F.3d at 542.  One must 13 look to state law to answer the question, "'some evidence' of what?"

14

15 B.     <u>State Law Standards For Parole For Murderers In California</u>

16       California uses indeterminate sentences for most non-capital murders, with the term being 17 life imprisonment and parole eligibility after a certain minimum number of years.  A first degree 18 murder conviction yields a minimum term of 25 years to life and a second degree murder 19 conviction yields a minimum term of 15 years to life imprisonment.  <u>See</u> <u>In re Dannenberg</u>, 34 20 Cal. 4th 1061, 1078 (Cal.), <u>cert. denied</u>, 546 U.S. 844 (2005); Cal. Penal Code § 190.  The 21 upshot of California's parole scheme described below is that a release date normally must be set 22 unless various factors exist, but the "unless" qualifier is substantial.

23       A BPH panel meets with an inmate one year before the prisoner's minimum eligible 24 release date "and shall normally set a parole release date. . . . The release date shall be set in a 25 manner that will provide uniform terms for offenses of similar gravity and magnitude in respect 26 to their threat to the public, and that will comply with the sentencing rules that the Judicial 27 Council may issue and any sentencing information relevant to the setting of parole release 28 dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall

5

set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[2] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The federal habeas court's task is not to determine whether some evidence supports the reasons cited for the denial of parole, "but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers the public safety." Hayward, 512 F.3d at 543 (citation omitted).

A critical issue in parole denial cases concerns the parole authority's use of evidence

---

[2] The listed circumstances tending to show <u>unsuitability</u> for parole are: the nature of the commitment offense (i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner"), the prisoner has a previous record of violence, the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense, and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show <u>suitability</u> for parole are: the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).

6

1  about the murder that led to the conviction.  Four Ninth Circuit cases provide guidance for
2  applying the <u>Superintendent v. Hill</u> some evidence standard on this point: <u>Biggs v. Terhune</u>, 334
3  F.3d 910 (9th Cir. 2003), <u>Sass</u>, 461 F.3d 1123, <u>Irons v. Carey</u>, 505 F.3d 846 (2007), and, most
4  recently, <u>Hayward</u>, 512 F.3d 536.  <u>Biggs</u> explained that the value of the criminal offense fades
5  over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and
6  requires a careful balancing and assessment of the factors considered. . . .  A continued reliance
7  in the future on an unchanging factor, the circumstance of the offense and conduct prior to
8  imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could
9  result in a due process violation."  <u>Biggs</u>, 334 F.3d at 916-17.  <u>Biggs</u> upheld the initial denial of
10 a parole release date based solely on the nature of the crime and the prisoner's conduct before
11 incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate
12 exemplary behavior and evidence of rehabilitation, denying him a parole date simply because
13 of the nature of Biggs' offense and prior conduct would raise serious questions involving his
14 liberty interest in parole."  <u>Id.</u> at 916.  Next came <u>Sass</u>, which criticized the <u>Biggs</u> statements as
15 improper speculation and beyond the scope of the dispute before the court.  <u>Sass</u>, 461 F.3d at
16 1129.  <u>Sass</u> determined that the parole board is not precluded from relying on unchanging factors
17 such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in
18 determining parole suitability.  <u>See id.</u> (commitment offenses in combination with prior offenses
19 provided some evidence to support denial of parole at subsequent parole consideration hearing).
20 The next decision, <u>Irons</u>, aligned with <u>Biggs</u>, determining that due process was not violated by
21 the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16
22 years into his 17-to-life sentence, but emphasized that in all three cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>)
23 in which the court had "held that a parole board's decision to deem a prisoner unsuitable for
24 parole solely on the basis of his commitment offense comports with due process, the decision
25 was made before the inmate had served the minimum number of years required by his sentence."
26 <u>Irons</u>, 505 F.3d at 853.   Most recently, <u>Hayward</u> granted relief to a prisoner who had been in
27 custody 27 years on his 15-to-life sentence.  <u>Hayward</u> repeated the quoted passage from <u>Biggs</u>
28 and stated <u>Irons</u> had noted that "'in some cases, indefinite detention based solely on an inmate's

7

commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.' Irons, 505 F.3d at 854. 'The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.' [In re] Scott, 133 Cal.App.4th [573, 595 (Cal. Ct. App. 2005)]." Hayward, 512 F.3d at 545.[3]

The message of these cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs, Irons, and Hayward). Also, the focus must be on whether the commitment offense demonstrates present dangerousness if it is relied upon to deny parole (Hayward). Superintendent v. Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

C.     Some Evidence Supports The BPH's Decision

The BPH identified the circumstances of the murder, Paluzzi's escalating criminality and his need for further therapy regarding the causative factors for the commitment offense as the reasons for the determination that he was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison

---

[3] The California Supreme Court has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense"). Hayward does not explain how Dannenberg's more-than-the-minimum-elements rule fits into the picture, and simply ignores it.

8

1   The crime was summarized in the probation officer's report and at the 2000 hearing. On May 2, 1980, a 64-year old man and his wife were at a gas station dealing with car trouble. In preparing to leave one car at the station and take their other car home, the man was taking things out of the trunk of one car and putting them in the trunk of the other car. Meanwhile, Paluzzi drove into the station, retrieved his rifle from his car, put the rifle on top of his car, aimed at the man, shot him in the head, put the rifle back in his car, finished pumping gas, and drove away without paying for the gas. See RT 12-13; Resp. Exh. B. The man died from the gunshot to the head.

Paluzzi has always attributed the killing to his drug use. He explained that he was "a serious drug abuser at the time, I had a serious drug problem, there's no doubt about it." RT 14. He claimed he had ingested crystal meth the day before the killing to hide them when he was stopped by the police. RT 15-16. He further claimed that, due to his ingestion of drugs, he was in "a toxic state of psychosis" and delusional when the crime occurred. RT 16-17. He claimed he shot the victim because he was under the delusion that the victim had been part of an invasion force that was poisoning children and he was supposed to shoot him. RT 18. He gave a non-responsive answer when asked if he remembered shooting the victim, see RT 18, but was quite certain that he retrieved the rifle from the front seat rather than trunk of his car, see RT 12-13.

The BPH was dubious of Paluzzi's explanations about his delusions, noting they were inconsistent. See RT 44-45. The delusions had been described differently by Paluzzi in earlier interviews, and Paluzzi also earlier denied remembering shooting the victim. See, e.g., RT 17-18, 44-50; Resp. Exh. C, p. 3, Resp. Exh. E at Exh G, p. # 2, and Resp. Exh. E at Exh. J, p. 15. The BPH also appeared skeptical about Paluzzi's claim that the killing was committed while he was in a drug-induced delusional state, apparently because of some his purposeful activities to avoid apprehension, such as that he had wiped the fingerprints from the weapon and had fled from the police in a vehicle and then on foot before being apprehended the next day. RT 53-55. The commissioners grew exasperated with Paluzzi because they felt he was continuing a pattern of not addressing the issues related to the commitment offense. RT 55.

The BPH also considered Paluzzi's pre-incarceration factors, including his criminal

1 history. See Resp. Exh. E at Exh. G (probation report). In May 1975 (just weeks before his 18th
2 birthday), he was charged with hit and run, driving under the influence of drugs, and reckless
3 driving; he pled guilty to hit and run and was given two years of probation. In June 1975, he
4 was arrested for possession of marijuana, and was given one year of probation. In March 1976,
5 he was arrested for possession of marijuana for sale and later in March 1976, he was arrested for
6 possession of amphetamine; he was committed to the CYA for those offenses and paroled in
7 November 1977. Less than two months later (in January 1978), he was arrested for driving
8 while intoxicated and was again put on probation. Five months later (in May 1978), he was
9 arrested for burglary, petty theft, battery, and assault with a deadly weapon.[4] His sentence for
10 that offense included jail time plus a suspended sentence, plus probation, plus the revocation of
11 an earlier probation. Later that year (in October 1978), he was arrested for driving while
12 intoxicated and was again put on probation and again had an earlier probation revoked. On May
13 28, 1979, he was arrested for driving while intoxicated; after he failed to appear for that charge,
14 a bench warrant was issued and he was sentenced to 90 days in jail. Id. The murder that led to
15 his current sentence occurred less than a year later. Paluzzi agreed that the record indicated that
16 he had repeatedly been put on probation, re-offended and received more probation time. RT 24.

17 The BPH also considered other information about pre-incarceration factors. Paluzzi was
18 the only member of his family that had criminal troubles. He was one of four children; he
19 remains in contact with his parents and his siblings. RT 25. He started getting in trouble in
20 school at about age 9 or 10. RT 25. At about age 12, he started using alcohol, and that led to
21 drug abuse and rebellion. RT 26. By age 16, he had a drug abuse problem. He used
22 amphetamines mostly, and speed and heroin for a small amount of time. RT 26. The probation
23 report also stated that Paluzzi had reported using LSD, heroin, speed, PCP, marijuana, valium,
24 and morphine. Resp. Exh. E at Exh. G (probation report).

25 The BPH considered Paluzzi's prison record. He had many positive accomplishments in

---

[4] Paluzzi stated that this arrest resulted from an incident on his 21st birthday in which he had a dispute with a liquor store clerk about paying for liquor. During a scuffle that followed the argument about paying for the liquor, he hit the owner of the liquor store in the head with the bottle. RT 22-23.

10

prison. He had completed training in dry cleaning. RT 26. He also claimed to have completed vocational training in sewing machine repair, diesel mechanics, welding, and waste management, although the commissioner's comments indicated that Paluzzi's file did not include certificates of completion. See RT 26-27. Paluzzi completed high school in 1976 at the CYA and had taken some college classes in prison, but his file did not include the transcripts to evidence that he had taken those classes. RT 28. Since his most recent parole hearing, his activities had focused on A.A. participation. RT 29. He also had participated in N.A. RT 29. Earlier in his incarceration, Paluzzi had completed other self-help programs, such as "Cat. X" and substance abuse programming. RT 29.

Paluzzi also had some misconduct in prison. He had received six CDC-115 rule violation reports, the last one occurring in October 1987. In the disciplinary matters, he had been found guilty of sniffing intoxicants in October 1981, impeding inmate counts in December 1981, being disrespectful toward staff in August 1982, exhibiting a clenched fist at a sergeant and refusing orders in February 1983, committing a physical assault on another inmate in August 1985, and refusing a direct order in October 1987. See Resp. Exh. E at Exh. J, p. 31. He also had received six CDC-128 counseling memoranda, for lesser infractions, the last one occurring in May 1999. RT 30, 32.

His counselor opined that he would probably pose a moderate to low degree of threat to the public. RT 30. Another counselor's report from January 2000 was less favorable, but Paluzzi challenged the adequacy of the statistical information on which it was based. See RT 33-34. A psychiatric report dated March 2000 was positive; the psychologist opined that Paluzzi's violence potential was estimated to be no more than the average citizen in the community if released. RT 35-36.

The BPH reviewed Paluzzi's parole plans. He intended to stay with his sister and her husband, who were moving from San Bernardino to Orange County. If the law required him to parole to the county in which he last resided, he intended to live with his parents until he could find a place to live. RT 37-39. He had letters of support from his family members. RT 39-42.

Paluzzi's attorney and Paluzzi made closing statements before the BPH recessed to

deliberate. RT 56-66. His attorney's comments indicate that Paluzzi had raised an insanity defense at trial, and the jury rejected it even though several experts opined he was temporarily insane. RT 57-58. Paluzzi attributed all his crimes to drug abuse and contended that, since he didn't use drugs anymore, he would not re-offend. RT 64.

The BPH decided that Paluzzi was "not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." RT 67. The first reason articulated in support of that determination was that the commitment offense had been carried out in an especially cruel and callous manner. Among other things, the BPH noted that the killing was carried out in a dispassionate manner that demonstrated an exceptionally callous disregard for human life. The BPH also noted that motive was inexplicable or very trivial. The BPH considered a circumstance and factors proper under California law. A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). The factors to be considered in determining whether that circumstance exists included whether it "was carried out in a dispassionate and calculated manner, such as an execution-style murder." 15 Cal. Code Regs. § 2402(c)(1)(B). Paluzzi's crime fit in this category. The killing also certainly qualified as one done for an "inexplicable" motive. 15 Cal. Code Regs. § 2402(c)(1)(E). The facts of this murder were far beyond the minimum elements of a second degree murder. See Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th at 682-83.

In addition to the murder, the BPH identified Paluzzi's "escalating pattern of criminal conduct and [his failure] to profit from society's previous attempts to correct his criminality." RT 68. Consideration of and reliance on Paluzzi's pre-offense criminal history was not improper. Although the prisoner's "previous record of violence" on a victim is a specifically listed circumstance and non-violent criminal history is not specifically listed as a circumstance that tends to indicate unsuitability, 15 Cal. Code Regs. § 2402(c)(2), the list of circumstances in § 2402(c) is non-exclusive, and § 2402(b) specifically allows the BPT to consider a great range of relevant and reliable information, such as the prisoner's "past criminal history, including

involvement in other criminal misconduct which is reliably documented." Paluzzi's prior criminal activity could be considered by the BPT as tending to show unsuitability. His criminal record included convictions for possession of drugs, possession of drugs for sale, driving under the influence (three times), hit and run, theft and battery. Paluzzi had been in and out of custody and on and off probation, but had not learned from those experiences. He also had an extremely serious substance abuse problem that was part of his criminality.

Finally, the BPH decided that Paluzzi needed "additional time to fully understand and deal with the causation factors which led to the commitment offense." RT 68. This determination was based on the commissioners' dissatisfaction with Paluzzi's shifting versions of the murder and surrounding events. This reason to deny parole was permissible: 15 Cal. Code Regs § 2402(b) allows the BPH to consider all relevant information, including the prisoner's "past and present mental state," and "past and present attitude toward the crime." The BPH was reasonable in its concern about Paluzzi's acceptance of his responsibility for the murder. While he technically had accepted responsibility, he described it as the product of a drug-induced delusion but had given differing versions of what that delusion consisted of – and that shifting story caused concern about the truthfulness of it. See, e.g., RT 17-18, 44-50; Resp. Exh. C, p. 3, Resp. Exh. E at Exh G, p. 2, and Resp. Exh. E at Exh. J, p. 15. His psychological report from March 2000 indicated Paluzzi had no mental illness and no history of mental illness, which was an odd evaluation in light of his report that three experts found him temporarily insane at the time of the crime and his attribution of the murder to delusional thinking. See Resp. Exh. E at exhibit J (psychological report).

The BPH's decision satisfied due process.[5] There was more than some evidence to support the BPH's decision that Paluzzi was not suitable for parole about 20 years into his 17 to

---

[5] Due to the unusual exhaustion issue in this case, the court has considered the due process question with and without the deference required by 28 U.S.C. § 2254(d), and has reached the same conclusion under either approach. The San Bernardino County Superior Court's decision was not contrary to or an unreasonable application of the Superintendent v. Hill some evidence standard. Even assuming arguendo that § 2254 does not apply as a result of the California Supreme Court's rejection of Paluzzi's petition for the procedural reason that administrative remedies had not been exhausted before the state court habeas petition was filed, the court concludes that the BPH's decision did not violate Paluzzi's due process rights.

13

life sentence. The BPH's negative view of his crime was not just rote recitation of the statutory factor without any real consideration of the facts of the murder. There is a range of second degree murders, with some being worse than others, regardless of the fact that all show up as the same kind of conviction on paper. This killing was clearly worse than many other second degree murders, as Paluzzi had randomly selected and shot an elderly man in the head who had zero contact with him and probably had no inkling his life was going to end. The BPH was reasonably concerned that Paluzzi had not explored the causative factors relating to the murder. Paluzzi had always attributed the murder to a drug-induced delusion, and was convinced that simply avoiding drugs was the way to avoid further criminal activity. See RT 64. Assuming that Paluzzi's drug abuse ended when he entered prison or after his disciplinary infraction for sniffing intoxicants in 1981, his later disciplinary offenses suggested that not all his misbehavior could be attributed to drug use. The BPH also doubted the drug-induced delusion story (based on the shifting nature of parts of it) and obviously was concerned about Paluzzi's ability to remember certain specific details (such as where the rifle came from) while avoiding answering questions about other more difficult details (such as whether he remembered firing the fatal shot). This was a most callous killing done by a man who had developed an extremely serious substance abuse problem and had not profited from society's earlier efforts to correct his criminality. Although Paluzzi had many accomplishments in prison, and had remained discipline-free for thirteen years before the hearing, the BPH did not violate due process in concluding that he was not suitable for parole in 2000. Paluzzi is not entitled to the writ.

## CONCLUSION

For the foregoing reasons, the petition is denied. The clerk shall close the file.

IT IS SO ORDERED.

DATED: May 1, 2008

SUSAN ILLSTON
United States District Judge